IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| VERLYN SERRANO, obo A.D., | ) | CASE NO. 1:14 CV 1344 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | WILLIAM H. BAUGHMAN, JR. |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

## Introduction

**A.      Nature of the case and proceedings**

Before me[1] is an action by Verlyn Serrano, on behalf of A.D., a minor, under

42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social

Security denying his application for supplemental security income.[2] The Commissioner has

answered[3] and filed the transcript of the administrative record.[4] Under my initial[5] and

---

[1] ECF # 19. The parties have consented to my exercise of jurisdiction.

[2] ECF # 1.

[3] ECF # 14.

[4] ECF # 15.

[5] ECF # 9.

procedural[6] orders, the parties have briefed their positions[7] and filed supplemental charts[8] and the fact sheet.[9]

## B.    Background facts and decision of the Administrative Law Judge ("ALJ")

A.D., a minor child who was 12 years old at the time of the May 30, 2012 hearing, completed the sixth grade and has never worked.

The ALJ, whose decision became the final decision of the Commissioner, found that from June 27, 2007, the amended alleged onset date, through the date of his decision, A.D. had the following severe impairments: attention deficit hyperactivity disorder ("ADHD"), adjustment disorder with anxiety and depression, borderline intellectual functioning, learning disorder, nocturnal enuresis, and asthma.[10]

The ALJ concluded that from June 27, 2007, the amended alleged onset date, through the date of his decision, A.D. did not and does not have an impairment or combination of impairments that met, meets, medically equaled, or medical equals the severity of one of the Listed Impairments in the Listing of Impairments, 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).[11] The ALJ further concluded that A.D. did not and

---

[6] ECF # 16.

[7] ECF # 17 (Serrano's brief); ECF # 24 (Commissioner's brief).

[8] ECF # 17-1 at 2-10 (Serrano's charts); ECF # 25 (Commissioner's charts).

[9] ECF # 17-1 at 1 (Serrano's fact sheet).

[10] Transcript ("Tr.") at 38.

[11] *Id.* at 41.

does not have an impairment or combination of impairments that functionally equals the severity of the Listing of Impairments (20 CFR 416.924(d) and 416.926a).[12]

## C.    Issues on judicial review and decision

Serrano asks for reversal of the Commissioner's decision on the ground that it does not have the support of substantial evidence in the administrative record. Specifically, Serrano presents the following issues for judicial review:

- The ALJ found at Step Three that A.D.'s impairments did not meet or equal Listing § 112.05. Does substantial evidence support this finding?

- The ALJ did not consider the evaluation of the consultative examiner indicating that A.D. had the full scale IQ score of 68. Does the ALJ's failure to consider the consultative examiner's evaluation constitute reversible error?

- The ALJ found that A.D. did not meet the additional requirements of the Listing in both social functioning and attention and concentration based on school and medical reports. Does substantial evidence support this finding?

- The ALJ found that A.D. did not have an impairment or combination of impairments that functionally equaled a listing, particularly in the domain of "acquiring and using information" or, alternatively, in both the "acquiring and using information" and "attending to and completing tasks" domains. Does substantial evidence support this finding?

For the reasons that follow, I will conclude that the ALJ's finding of no disability is supported by substantial evidence and, therefore, must be affirmed.

---

[12] *Id.* at 44.

## Analysis

**A.      Standard of review - substantial evidence**

The Sixth Circuit in *Buxton v. Halter* reemphasized the standard of review applicable to decisions of the ALJs in disability cases:

> Congress has provided for federal court review of Social Security administrative decisions. 42 U.S.C. § 405(g). However, the scope of review is limited under 42 U.S.C. § 405(g): "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." In other words, on review of the Commissioner's decision that claimant is not totally disabled within the meaning of the Social Security Act, the only issue reviewable by this court is whether the decision is supported by substantial evidence. Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "
>
> The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.[13]

Viewed in the context of a jury trial, all that is necessary to affirm is that reasonable minds could reach different conclusions on the evidence. If such is the case, the Commissioner survives "a directed verdict" and wins.[14] The court may not disturb the Commissioner's findings, even if the preponderance of the evidence favors the claimant.[15]

---

[13] *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted).

[14] *LeMaster v. Sec'y of Health & Human Servs.*, 802 F.2d 839, 840 (6th Cir. 1986); *Tucker v. Comm'r of Soc. Sec.*, No. 3:06CV403, 2008 WL 399573, at *6 (S.D. Ohio Feb. 12, 2008).

[15] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

I will review the findings of the ALJ at issue here consistent with that deferential standard.

**B.     Application of standard**

This case largely centers on the question of whether the ALJ properly concluded at Step Three of the sequential evaluation process that A.D. did not meet or equal the listing at Section 112.05. In that regard, Serrano contends that: (1) the ALJ ignored a full-scale IQ score of 68; and (2) failed to credit findings that A.D. has an "extreme" limitation in the domain of acquiring and using information, or alternatively, "marked" limitations in that domain and the domain of attending to and completing tasks.

*1.     Section 112.05*

Section 112.05 addresses mental retardation in a child under the age of 18.[16] In relevant part, Section 112.05(E) defines mental retardation as being evidenced by: (1) a valid verbal, performance or full scale IQ of 60 through 70, and (2) a marked limitation or difficulty in one of three functional areas: (i)  social functioning, (ii) personal functioning, or (iii) concentration, persistence or pace.[17] Moreover, to fully meet the listing here, a claimant must initially satisfy the definition of mental retardation set out in the listings introductory paragraph, and then meet the two-part test outlined above.

---

[16] The term mental retardation has been replaced by the term intellectual impairment. Because the prior term was utilized in the ALJ's decision and in the briefs, it will be used here.

[17] §§ 112.05(E); 112.02(B)(b)-(d).

The initial introductory paragraph is not at issue here, but the ALJ's decision as to both prongs of 12.05(E) is challenged by Serrano. They will be addressed separately below.

Serrano also challenges the finding that A.D. did not functionally equal the listing. That issue will also be addressed separately.

## 2. *The IQ score*

The IQ score at issue is a single full scale IQ score of 68 that was obtained in November, 2007 by consultative examining psychologist David House, Ph.D.[18] On that test - a WISC-IV intelligence test - A.D. achieved a score of 67 on the verbal section and 94 on the processing section, yielding the composite score of 68.[13] His worst score was in working memory, where he received a score of 52.[14] Dr. House noted this score was usually in the mildly mentally retarded range, but concluded that A.D. was not mentally retarded, but rather had borderline intellectual functioning, with the presence of learning disorders.[15]

In the other IQ test found in this record - an October, 2007 WISC-IV test administered by supervised school psychologist assistant Meghan Flanagan, M.Ed. - A.D. received a full-scale composite score of 79, which reflected a verbal score of 89 and a processing score of

---

[18] Tr. at 481.

[13] *Id.*

[14] *Id*.

[15] *Id*.

100.[16] Flanagan concluded that A.D. was in the borderline intellectual functioning range and could think, reason and problem solve when presented with enough information.[17]

The ALJ explicitly took note of the two IQ scores described above, and in an extensive analysis concluded that the lower score was not the correct measure of A.D.'s intellectual functioning.

The ALJ began the analysis by observing that both IQ tests were consistent in finding that working memory was a "known difficulty" for A.D.[18] Moreover, he also noted that A.D.'s scores in the areas of processing and perceptual reasoning were "relatively consistent" in both tests.[19] But, the opinion went on, the difference between the two test results for verbal comprehension were outside the margin of error, and such a "dramatic deviation is far too large" to be the result of any error caused by faulty test administration or the fact that the tests were conducted within months of each other.[20]

Instead, the ALJ reasoned, the variance existed because A.D.'s performance on the test conducted by Dr. House "is an underestimation of his abilities."[21] To that point, the opinion cited the results of achievement tests conducted by both Flanagan and Dr. House,

---

[16] *Id*. at 538-39.

[17] *Id*.

[18] *Id*. at 43.

[19] *Id*.

[20] *Id*.

[21] *Id*.

where Flanagan found math calculation to be a marked strength, but Dr. House found significant weakness.[22] Similarly, the ALJ observed that while Dr. House "noted the most severe social problems of any source in the record," the other evidence demonstrated that A.D. "has friends, plays in organized sports, and has no documented disciplinary problems at school."[23] Finally, the ALJ underscored "the fact that Dr. House himself did not diagnose [A.D] as mentally retarded, and did [not] specifically endorse the IQ test results as valid, even though he did so for other tests in the session."[24]

On that basis, the ALJ determined that "the IQ testing by Dr. House is rejected as invalid," and thus the remaining higher IQ results from the Flanagan test preclude a finding that A.D. met or equaled the listing at Section 112.05C,D, or E.[25]

As noted, Serrano contests the ALJ's decision as it concerns Section 112.05E. She argues that although an ALJ may reject an IQ score if it is inconsistent with the other evidence of record, the decision here to reject Dr. House's IQ test was flawed because the ALJ only cited to evidence supporting the higher score while essentially ignoring a record "replete with evidence supporting the accuracy of the 68 IQ score."[26]

---

[22] *Id*. (citing record).

[23] *Id*. (citing record).

[24] *Id*. (citing record).

[25] *Id*.

[26] ECF # 17 at 10.

Serrano's argument here is substantially similar to that recently considered and rejected by the Sixth Circuit in *Barnett, ex rel. D.B. v. Commissioner of Social Security*.[27] In that case, the Sixth Circuit notes first that its published and unpublished precedents make clear that even in cases where an IQ score is low enough to support a finding of mental retardation, a denial of benefits will be affirmed if evaluating experts concluded that the claimant demonstrated borderline intellectual functioning, not mental retardation.[28] Moreover, while an ALJ "may consult IQ scores in evaluating intellectual functioning," equating a particular IQ score with a finding of "'significantly subaverage' intellectual functioning overstates the relevance of the score."[29] Rather, the regulations make clear that when considering the validity of any IQ test result, the ALJ is to note and resolve any discrepancies between "the formal test results and the child's customary behavior."[26]

Finally, *Barnett* restates the long-standing rule regarding "the forbidden field of re-weighing the evidence."[27] *Barnett* emphasizes that the reviewing court "must 'accept the *agency*'s factual finding[]' when it is supported by substantial evidence, even when substantial evidence could justify a different result."[28] An ALJ's decision to reject a lower

---

[27] *Barnett v. Comm'r of Soc. Sec.,* 573 Fed. Appx. 461 (6th Cir. 2014).

[28] *Id*. at 463.

[29] *Id*. at 463-64.

[26] *Id*. at 464 (quoting 20 C.F.R. Pt. 404, Subpt. P., App.1, § 112.00(D)(8)).

[27] *Id*.

[28] *Id.* (emphasis original)(quoting *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

IQ result, when supported by substantial evidence as to why a higher score is more credible, falls within that zone of choice.[29]

Serrano likewise essentially invites me to re-weigh the evidence as to which IQ score is more valid. Consistent with *Barnett* and the applicable regulations, I find that the ALJ acted properly in how he arrived at the conclusion that the Flanagan IQ test was the more valid score, and in making the final determination that A.D. was not mentally retarded because every evaluating expert had instead diagnosed him as demonstrating borderline intellectual functioning. I thus decline the invitation to re-weigh any evidence proffered by Serrano which may tend to support a different finding, holding that the Commissioner here acted within his well-recognized zone of choice.

## 2.    *The functional areas*

In addition to challenging the ALJ's findings as to IQ under the first prong of Section 12.05(E)'s two-part test, Serrano also disputes the ALJ's findings as the second prong, which goes to whether A.D. has marked impairment in one of three specified areas.

I note first that the preceding decision to affirm the ALJ on the question of the IQ tests is enough by itself to foreclose meeting this listing. Because a claimant must have both an IQ score within the specified range *and* marked impairments in at least one designated area in order to meet the listing, the fact that A.D.'s IQ scores are not within the specified range

---

[29] *Id.*

-10-

fully defeats a claim for benefits. But I will undertake a brief review of this second prong of the listing in the interest of thoroughness.

Serrano asserts that A.D. met the additional qualification of Section 112.05(E) in that he had marked difficulties in social functioning, as well as in maintaining concentration.[30] She argues that the ALJ's decision to the contrary was supported on the record by just a general reference to "teachers notes" that purportedly showed he "is reasonably hard working and diligent," and that his "mental status exams show good attention."[31] But, she claims, the school and medical records provide specific, detailed examples of A.D.'s deficiencies in these areas.[32]

Thus, Serrano maintains, the ALJ "failed to actually evaluate all the evidence in the record, failed to identify the medical and school evidence upon which he relied, failed to compare the evidence to Section 112.05E of the Listing, and otherwise failed to explain his conclusion."[33]

In response, the Commissioner contends that the record supports the ALJ's finding in this regard.[34] Except for a single instance where the Commissioner cites to the ALJ's

---

[30] ECF # 17 at 12.

[31] *Id*. (citing record).

[32] *Id*. at 12-13.

[33] *Id*. at 14.

[34] ECF # 24 at 13.

-11-

opinion as to A.D.'s participation in a baseball team,[35] all the evidence assembled and presented here by the Commissioner on this issue reflects counsel's own review of the record and counsel's own independent analysis as to why the ALJ's decision is ultimately based on the record.[36] While, once again, the Commissioner's counsel has here displayed great skill and  thoroughness in combing the record for relevant evidence, and then crafting a strong argument for the desired result, this Court is charged with reviewing  the reasons actually articulated by the ALJ in the opinion, and not the newly-fashioned work product of Commissioner's counsel.[37]

That said, it must also be noted that the ALJ did note that a 2011 evaluation of A.D. by a counselor, which made the finding about his participation in baseball, also found that although A.D. was "oppositional and argumentative," he "would accept redirection."[38] Similarly, the ALJ also previously made the specific finding that in another 2011 evaluation of A.D. by a psychiatric nurse, A.D reported having "lots of friends," and  was calm and

---

[35] *Id.* (citing tr. at 42).

[36] *See, id.* at 13-14 (citing tr. at 631-34, 714, 716, 725-26, 764-70, 775).

[37] *Hakkarainen ex rel. Blanton v. Astrue,* 2012 WL 389595, at *18 (N.D. Ohio, 2012)(citations omitted).

[38] Tr. at 40.

attentive.[36] A later evaluation in 2012 by a child psychiatrist also found that A.D. had good grades and that he was "calm and attentive" during the examination.[37]

Thus, although it is arguable that the ALJ should have connected these particular findings more directly to his analysis here, and so provided a more specific evidentiary basis for his reasoning, a holistic review of the total opinion must acknowledge that the ALJ was perhaps guilty of no more than attempting to abbreviate or summarize his earlier, more detailed findings. But, while the issue of when a holistic reading is appropriate or when it obscures a real failure to provide careful articulation in a specific analysis is an important question, it is not necessary to go any further into this matter here.

In the end, as noted above, A.D. can only meet the listing if he has both a qualifying IQ score and the requisite level of impairments. The fact, as also noted, that A.D. does not have the qualifying IQ score means that even if he could establish that the ALJ's reasoning was deficient as to the required level of impairments, he would still not meet the listing. Thus, any error here is harmless.

### 3.      *Functional equivalence*

To determine functional equivalence, an ALJ examines the effects of a claimant's impairments on six behavioral domains: acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating

---

[36] *Id*. at 41.

[37] *Id.*

-13-

objects, caring for oneself, and health and physical well-being.[38] A claimant is disabled if his impairments result in an "extreme" limitation in at least one domain or "marked" limitations in at least two.[39]

Serrano claims that the ALJ erred here by not finding that A.D. had an extreme limitation in the domain of acquiring and using information,[40] and/or a marked limitation in that domain as well as the one of attending and completing tasks.[41] The ALJ's decision in those domains is reviewed below.

a.      *Acquiring and using information*

In the domain of acquiring and using information, the ALJ found that A.D. had a marked limitation, but not an extreme one. In so doing, the ALJ first observed that such an extreme limitation would require that A.D. have an IQ no higher than 55, which is not the case.[42]Further, the ALJ found that the regulations provide that a claimant with A.D.'s IQ would be considered to have a "marked" limitation. [43] Finally, the ALJ considered the medical opinion of Dr. Charles Block, M.D., who testified as a medical expert.[44]

---

[38] 20 C.F.R. § 416.926a.

[39] *Id*.

[40] ECF # 17 at 14-17.

[41] *Id*. at 17-20.

[42] Tr. at 47.

[43] *Id*. at 47-48.

[44] *Id*. at 48.

-14-

The regulations define the distinctions between marked and extreme limitations, and do so by reference to standardized testing.

In particular, § 416.926a(e)(2)(I) states:

> "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

Section 416.926a(e)(3)(I) states:

> "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the level of functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

Serrano asserts that the ALJ here erred by focusing exclusively on A.D.'s test scores, and finding the absence of an extreme limitation solely because those scores were not three standard deviations below the mean.[45] She points out that the regulations provide for finding an extreme limitation even with higher standardized test scores if the claimant's functioning in day to day activities is seriously limited due to the impairment.[46] To that point, she maintains that A.D.'s school records "cumulatively show" that A.D. actually functioned at a level three standard deviations below the norm, and that his performance and function worsened over time.[47]

---

[45] ECF # 17 at 15.

[46] *Id*. (citing § 416.926a(e)(4)(ii)).

[47] *Id*. at 17.

-15-

But, as the Commissioner observes, the ALJ did not exclusively focus on the test scores in arriving at his decision. And Serrano's attempt to make the ALJ's purported exclusivity the focus of her objection simply obscures the fact that the ALJ properly related the applicable regulation, and then correctly noted that A.D. does not have low test scores such as would normally correlate with an extreme limitation.

Further, as the Commissioner also notes, the ALJ extensively discussed A.D.'s school records at an earlier section of the opinion. There, the ALJ did take note that broadly speaking A.D.'s non-math skills were below grade level in early reports in 2007, but also noted that these difficulties were due, at least in part, to external factors, such as "challenging and confusing social and family interactions."[48] Dr. Block, the ME, agreed with this conclusion in his testimony, noting while A.D. had severe academic problems, they were aggravated by the chronic disruptions caused by his home life.[49]

This is also consistent with a 2011 evaluation that A.D. was working below his ability level in school.[50] In addition, it is consistent with the 2007 testing that showed A.D. had functional articulation skills consistent with his age level, but difficulties with phonics and other language problems "negatively impacted his reading skills, comprehension and writing needs."[51] In this regard, I note in particular that the ALJ in his analysis of this issue

---

[48] Tr. at 40.

[49] *Id*. at 90.

[50] *Id*. at 40.

[51] *Id*. at 46.

specifically incorporated these prior findings stated above from earlier portions of the opinion.[52]

Thus, I find that substantial evidence supports the ALJ's finding that A.D.'s limitations in the domain of acquiring and using information are "marked," not "extreme."[51]

b.    *Attending and completing tasks*

The ALJ here found that A.D.'s limitations were "less than marked."[52] In so finding, he noted that Dr. Block, the ME, had reached this conclusion based on his review of the record from teachers, citing reports from teachers who said that while A.D. had problems in this area, they were not serious ones.[53] Moreover, the ALJ observed that although Dr. House stated that A.D.'s pace was "inconsistent" during testing, evaluators two months later found A.D. to be "very attentive" during the evaluation.[54]

While Serrano argues that this decision by the ALJ relies on "cherry-picked" evidence which ignores contrary findings,[55] she does not deal with the ME's clear conclusion that A.D.'s limitations were less than marked. As Magistrate Judge Knepp recently stated in a

---

[52] *Id*. at 47.

[51] *Id*.

[52] *Id*. at 49.

[53] *Id*.

[54] *Id*.

[55] ECF # 17 at 19-20.

-17-

similar childhood disability case, the rule is that "an ALJ may rely on ME testimony as substantial evidence if it is based on a review of the entire record."[56]

Here, the ME did review the entire record and then concluded that A.D.'s limitations in this area were less than marked, supporting that finding with reference to that portion of the record containing reports from A.D.'s teachers. The ALJ is entitled to rely on that conclusion. Thus, I find that substantial evidence supports the finding that A.D.'s limitations in this domain are less than marked.

In sum, because A.D.'s limitations were marked, but not extreme in the domain of acquiring and using information, and his limitations were less than marked in the domain of attending and completing tasks, I find that substantial evidence supports the ALJ's conclusion that A.D.'s impairment or combination of impairments did not functionally equal a listing.

---

[56] *Foreman ex rel. J.H. v. Comm'r of Social Security*, 4644849, at *7 (N.D. Ohio Aug. 4, 2015)(citing *Blakely*, 581 F.3d at 408-09).

-18-

**Conclusion**

Therefore, for the reasons given above, I find that substantial evidence supports the finding of the Commissioner that A.D. had no disability. Thus, the denial of Serrano's application on behalf of A.D. is affirmed.

IT IS SO ORDERED.

Dated: September 4, 2015                                    s/ William H. Baughman, Jr.
                                                           United States Magistrate Judge